IN THE UNITED STATES DISTRICT COURT FOR THE
EASTERN DISTRICT OF VIRGINIA

Alexandria Division

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>CARRINGTON JARIUS HAMMOND,<br>    a/k/a Tattoo,<br>    a/k/a Blitz,<br><br>and<br><br>MOHAMED AMINE HADDOU,<br><br>        Defendants. | Case No. 1:23-mj-154<br><br>**<u>UNDER SEAL</u>** |

**<u>AFFIDAVIT IN SUPPORT OF CRIMINAL COMPLAINTS AND ARREST WARRANTS</u>**

I, Vanessa Drew, Special Agent of the Drug Enforcement Administration ("DEA"), Washington Division Office, Washington, D.C., being duly sworn, depose and state the following:

## I.    INTRODUCTION

1.      This affidavit is submitted in support of arrest warrants and  criminal complaints charging that from in or about at least March 2023, and continuing thereafter up to and including in or around June 2023, the exact dates being unknown, within the Eastern District of Virginia and elsewhere, the defendants, CARRINGTON JARIUS HAMMOND, a/k/a Tattoo, a/k/a Blitz (hereinafter "HAMMOND"),  and MOHAMED AMINE HADDOU (hereinafter "HADDOU"), did unlawfully, knowingly, and intentionally combine, conspire, confederate and agree with others, known and unknown, to unlawfully, knowingly, and intentionally distribute 400 grams or more of a mixture and substance containing a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§ 841(a)(1) and 846.

2.      I am "an investigative or law enforcement officer" of the United States within the meaning of Title 18, United States Code, Section 2510(7), that is, an officer of the United States who is empowered by law to conduct investigations of and to make arrests for offenses enumerated in Title 18, United Sates Code, Section 2516.  I have been a Special Agent since March 2021.  I am currently assigned to the DEA High Intensity Drug Trafficking Area (HIDTA) Task Force located in Reston, Virginia. During my time in law enforcement, I have participated in the application for search warrants and have participated in the execution of numerous arrest and search warrants in the investigation of narcotics and organized crime related offenses, resulting in the prosecution and conviction of numerous individuals and the seizure of illegal drugs, weapons, stolen property, and other evidence of criminal activity.

3.      I graduated from the DEA Academy on July 16, 2021. The extensive training I completed at the DEA Academy consisted of various courses such as: Interview and Interrogation, Drug Identification, Confidential Source Management, Legal Procedures and law regarding Title 21, Report Writing, Evidence Handling, Surveillance, Raids, Combat Shooting, Defensive Tactics, and Physical Fitness. As a narcotics investigator, I have interviewed many individuals involved in drug trafficking and have obtained information from them regarding the acquisition, sale, importation, manufacture, and distribution of controlled substances. Through my training and experience, I am familiar with the actions, habits, traits, methods, and terminology used by drug traffickers and abusers of controlled dangerous substances.

4.      Based upon this experience, I have become knowledgeable about the methods and modes of narcotics operations, and the language and patterns of drug use and trafficking.  During the course of my participation in investigations of narcotics trafficking organizations, I have testified in grand jury proceedings. I have gained knowledge in the use of various investigative

techniques including the use of physical surveillance, undercover agents, confidential

informants, the controlled purchase of illegal narcotics, electronic surveillance, consensually

monitored recordings, investigative interviews, financial investigations, the service of

administrative and grand jury subpoenas, and the execution of search and arrest warrants.

5.      Wherever in this affidavit I discuss information resulting from physical

surveillance conducted in this investigation, that information, except where otherwise indicated,

does not set forth my own personal observations, but rather that which has been provided directly

or indirectly to me through other law enforcement officers who made such observations.

Additionally, unless otherwise noted, wherever I assert that a statement was made by an

individual, that statement is described in substance herein, and is not intended to be a verbatim

recitation of that statement.

6.      Law enforcement officers utilized a Confidential Source-1 (hereinafter "CS-1")[1]

in the course of this investigation.  For the purpose of this affidavit, this individual will be

referred to in the masculine gender regardless of their true gender.

7.      CS-1 was established as a confidential source by the Fairfax County Police

Department in April 2023.  During the time that CS-1 has been serving as a confidential source,

CS-1 has provided information which has proven to be truthful and to the extent possible has

been corroborated through various investigative techniques and independent investigation. To

---

[1] CS-1 is currently pending charges in Fairfax County, Virginia and the Eastern District of Virginia and is proactively cooperating and working with law enforcement in exchange for possible future consideration regarding the pending criminal charges. Further, since CS-1 began serving as a confidential source he has been twice arrested for the commission of new criminal felonies. Specifically, according to criminal record checks, in April 2023 he was charged in Fairfax County, Virginia for Possession of Schedule I or II Drugs, and in June 2023 CS-1 was arrested and charged with Possession with Intent to Manufacture/Sell/Distribute Schedule I or II controlled substance.

my knowledge, none of the information provided to me or any other members of law enforcement by CS-1 has proved to be false, misleading, or inaccurate in any material respect.

8.      I base the facts set forth in this affidavit upon my personal knowledge, information obtained during my participation in this investigation, knowledge obtained from other individuals including law enforcement personnel, and communications with others who have personal knowledge of the events and circumstances described herein. This affidavit does not contain every fact known to me or the government regarding this investigation, but rather contains information necessary to demonstrate probable cause to support the applied for criminal complaints and arrest warrants.

## II.      BACKGROUND CONCERNING FENTANYL AND COCAINE

9.      Cocaine is a schedule II-controlled substance that is derived from leaves of the coca plant.  Cocaine is an intense, euphoria-producing stimulant drug with strong addictive potential.  Cocaine generally appears in the form of a white, crystalline powder, but it can also be combined with other substances.

10.      Fentanyl is a schedule II-controlled substance and is a synthetic opioid pain reliever that comes in pharmaceutical forms that include transdermal patches and lozenges. Fentanyl is typically used to treat severe pain.  Fentanyl is estimated to be 50 to 100 times more powerful than morphine, and like other opioids it has strong addictive potential.  In addition to legitimate pharmaceutical production, fentanyl is also being produced in clandestine labs domestically and abroad and distributed through traditional opioid drug distribution networks, and more recently by way of Dark Net or Dark Web exchanges.  Illicitly produced fentanyl is often in powder form and is then combined with heroin or other substances to increase potency or add an opioid affect to an otherwise non-opioid drug.  It is common for drugs represented as heroin or other substances by distributors to be found to contain fentanyl when seized by law

4

enforcement.

11.     The most prolific form of fentanyl seen by law enforcement in this region in recent years is in the form of fake oxycodone pills containing fentanyl.[2] These pills are typically round blue pills imprinted with "M" and "30" and mimic the markings associated with pharmaceutical oxycodone 30mg pills.  Common slang terminology used to reference these fake oxycodone pills containing fentanyl include, but are not limited to: "blues" "M-30s," "30s" "Perc's," and "Perc-30's."  "Perc" is a commonly used slang reference that is short for "Percocet" which is a name brand prescription pain killer that contains oxycodone.

### III.     PROBABLE CAUSE

12.     The United States, including the Drug Enforcement Administration, is conducting a criminal investigation of HAMMOND, HADDOU, and others, regarding possible violations of 21 U.S.C. §§ 841(a)(1) and 846 (Conspiracy to Distribute Controlled Substances) and other criminal violations.

<u>Search Warrant Executed in Falls Church, Virginia on March 10, 2023</u>

13.     On March 10, 2023, the Alexandria Police Department (APD) Narcotics Unit executed multiple state search warrants in Falls Church, Virginia. Subsequently, APD Detectives seized evidence which included U.S. currency, multiple cell phones, and a United States Postal Service (USPS) parcel that contained a large number of fake oxycodone pills containing fentanyl. The fake oxycodone pills containing fentanyl were in the form of small round blue pills imprinted with an "M" and "30" that are known to law enforcement to be commonly referred to as "blues," "M30s," as well as other slang terminology.  The approximate gross weight of the

---

[2] Law enforcement is also commonly encountering fentanyl contained in a wide array of substances that are purported to be either other illicit narcotics or other types of pills/tablets that are in fact counterfeit pills containing fentanyl and which are designed to mimic the appearance of pharmaceutical medicines.

fake oxycodone pills containing fentanyl was 1,296 grams.  The search also resulted in the arrest

of two individuals who will be referred in this affidavit as Co-Conspirator–1 (hereinafter "CC-

1") and Co-Conspirator-2 (hereinafter "CC-2").  CC-1 has pending state charges in Alexandria,

Virginia related to Possession with Intent to Distribute Controlled Substances and Possession of

Ammunition by a felon.  CC-2 is facing a state charge in Alexandria for Possession with Intent to

Distribute Controlled Substances.

14.     A search of CC-1's cellphone, which was authorized by the state search warrant

for the Falls Church residence, revealed numerous text messages and photos related to the

shipment of parcels via USPS from Arizona to Northern Virginia, photographs and videos

depicting suspected controlled substances, telephone numbers for co-conspirators, and possible

addresses where parcels had been shipped. Review of the phone revealed that CC-1 was in

contact with several phone numbers that appeared to be phone numbers utilized by co-

conspirators, including phone number (703) XXX-5336 which was saved under the assigned

contact name of "TATTOO." Law enforcement subsequently identified "TATTOO" to be

HAMMOND.

15.     HAMMOND has been identified as a member of the conspiracy that has been

receiving the parcels containing narcotics that have been mailed from Arizona to Northern

Virginia and has also been identified as a distributor of fake oxycodone pills containing fentanyl,

cocaine, and firearms in the Eastern District of Virginia.

16.     As part of this investigation, law enforcement contacted the United States Postal

Inspection Service (USPIS) and shared information including addresses discovered in CC-1's

cellphone and other evidence gathered in their investigation. USPIS provided postal records

related to several of the addresses located in CC-1's cellphone.  USPS records revealed that in

the last few months several USPS parcels were mailed from Arizona to the Northern Virginia

addresses located in CC-1's phone.

17.     To further the investigation, Special Agents with the USPIS analyzed USPS

records to identify other possible addresses that may be associated with narcotics-laden parcels

being sent from Arizona to the Northern Virginia region. On multiple occasions, including

March 29 and April 10, 2023, law enforcement observed HAMMOND and HADDOU together

retrieve packages that had been mailed from Arizona to various addresses in the Eastern District

of Virginia.

Controlled Purchase from HAMMOND at an Apartment Complex on April 10, 2023

18.     On April 10, 2023, CS-1 conducted a controlled purchase of approximately 7

grams of suspected cocaine for $500 from HAMMOND. Under the direction of law

enforcement, CS-1 contacted HAMMOND to negotiate the purchase of cocaine from

HAMMOND.  Prior to becoming a confidential source, CS-1 served as a redistributor of

controlled substances for HAMMOND. During that time, CS-1 knew HAMMOND to use the

alias "BLITZ," and has BLITZ listed as the contact name for HAMMOND in CS-1's cellphone.

Prior to the controlled purchase, law enforcement searched CS-1 to ensure CS-1 did not have any

contraband and/or currency. A Fairfax County Detective acting in an undercover capacity

(hereinafter "UC") drove CS-1 to an apartment complex on North Kings Highway in Alexandria,

VA (hereinafter the "North Kings Highway apartment complex"), within the Eastern District of

Virginia.  The UC observed HAMMOND looking out the glass door located next to the

controlled access parking garage doors of the North Kings Highway apartment complex.

19.     The sale of cocaine to CS-1 by HAMMOND occurred in the stairwell beside the

parking garage of the North Kings Highway apartment complex. UC, who was parked directly

across the street from the parking garage, observed HAMMOND sell the cocaine to CS-1 through the glass door that accesses the stairwell where HAMMOND and CS-1 conducted the transaction.

20.     After completing the purchase from HAMMOND, CS-1 provided law enforcement with approximately 7 grams of suspected cocaine.  The suspected cocaine was submitted to the Virginia Department of Forensic Science for testing which revealed the 7 grams to be cocaine.

21.     Prior to the controlled purchase conducted on April 10, 2023, CS-1 and HAMMOND had discussions concerning the purchase of cocaine and fake oxycodone pills containing fentanyl both in person and via HAMMOND's telephone number CS-1 informed law enforcement that during those conversations HAMMOND told CS-1 that he (HAMMOND) had access to large quantities of cocaine, but at that time he (HAMMOND) was waiting for "blues" to arrive in the mail.  I know from training and experience that "blues" is a common slang terminology used by drug users and distributors that references fake oxycodone pills containing fentanyl.  CS-1 subsequently made the seven-gram purchase of cocaine from HAMMOND on April 10, 2023, that is detailed above.

Controlled Purchase of a Handgun and Cocaine from HAMMOND
at the North Kings Highway apartment complex on April 17, 2023

22.     On April 16, 2023, CS-1 notified law enforcement that HAMMOND offered to sell CS-1 a handgun for $900 via text messages.  Law enforcement directed CS-1 to advise HAMMOND that CS-1 would purchase the handgun the following day, and further directed CS-1 to inform HAMMOND that CS-1 also wanted to purchase an additional 7 grams of cocaine from HAMMOND for $500.

23.     On April 17, 2023, CS-1 conducted a controlled purchase of a handgun for $900, and approximately 7 grams of suspected cocaine for $500, from HAMMOND.  Prior to the controlled purchase, law enforcement searched CS-1 to ensure CS-1 did not have any contraband and/or currency.  UC again drove CS-1 to the North Kings Highway apartment complex.  Upon arrival to the North Kings Highway apartment complex, UC observed HAMMOND looking out the glass door located next to the controlled access parking garage doors of the North Kings Highway apartment complex.

24.     The sale of the handgun and cocaine to CS-1 by HAMMOND occurred in the stairwell beside the parking garage of the North Kings Highway apartment complex.  UC, who was parked directly across the street from the parking garage, observed HAMMOND sell the cocaine and handgun to CS-1 through the glass door that accesses the stairwell where HAMMOND and CS-1 conducted the transaction. After completing the purchase from HAMMOND, CS-1 provided law enforcement with a polymer 9 mm handgun that contained no serial number (which is commonly referred to as a "ghost gun") and approximately 7 grams of suspected cocaine.  The cocaine was submitted to the DEA Mid-Atlantic Lab for analysis, which revealed the substance was Cocaine Hydrochloride with a weight of 6.98 grams.

<u>Installation of Electronic Surveillance at<br>The North Kings Highway Apartment Complex</u>

25.     Law enforcement subpoenaed leasing records from the North Kings Highway apartment complex revealed that an apartment within the complex is leased to HAMMOND's wife. The North Kings Highway apartment complex leasing records also showed SUBJECT VEHICLE-1, is one of two vehicles listed under the parking addendum associated with that lease.

26.     To further the investigation, on April 28, 2023, law enforcement established electronic surveillance via live video footage of the door to HAMMOND's apartment at the North Kings Highway apartment complex. The camera (hereinafter the "North Kings Highway electronic surveillance camera") was installed in a communal hallway of the North Kings Highway apartment complex and directed toward the entryway door of apartment 342. At the time of this affidavit, the camera is still in place.

Controlled Purchase from HAMMOND and HADDOU at<br>The North Kings Highway Apartment Complex on May 8, 2023

27.     On May 8, 2023, law enforcement utilized CS-1 to conduct a controlled purchase of approximately 1,000 fake oxycodone pills containing fentanyl for $2,500, along with 7 grams of suspected cocaine for $500, from HAMMOND.  CS-1 contacted HAMMOND to coordinate the transaction.  Under law enforcement direction, CS-1 purchased the fake oxycodone pills containing fentanyl and cocaine from HADDOU, who HAMMOND sent to conduct the sale on his behalf. The sale of the fentanyl pills and cocaine occurred in a stairwell beside the parking garage of the North Kings Highway apartment complex.  A review of the North Kings Highway electronic surveillance camera showed HADDOU leaving his apartment a short time prior to selling the fentanyl pills and cocaine to CS-1 and showed HADDOU returning to his apartment a short time following the sale of drugs to CS-1. The fentanyl was submitted to the DEA Mid-Atlantic Lab for analysis, which revealed the substance was 981 counterfeit pills with a weight of 108.39 grams.

Controlled Purchase from HAMMOND and HADDOU at<br>The North Kings Highway Apartment Complex on June 1, 2023

28.     On June 1, 2023, law enforcement utilized CS-1 to conduct a controlled purchase of approximately 2,000 fake oxycodone pills suspected to contain fentanyl for $4,000, from

HAMMOND. CS-1 contacted HAMMOND to coordinate the transaction. Under law enforcement direction, CS-1 purchased the fake oxycodone pills containing fentanyl from HADDOU, who HAMMOND sent to conduct the transaction on his behalf. The sale of the 2,000 pills occurred in the lobby of the North Kings Highway Apartment Complex building. Following the purchase from HADDOU, CS-1 turned over the approximately 2,000 fake oxycodone pills to law enforcement concealed within a brown paper bag that HADDOU had provided. A review of the North Kings Highway electronic surveillance camera showed HADDOU leaving his apartment while holding a brown paper bag a short time prior to the sale of the fentanyl pills to CS-1.   The pills were submitted to the DEA Mid-Atlantic Lab for analysis, which revealed the substance was 1,981 counterfeit pills with a weight of 216.8 grams.

Controlled Purchase from HAMMOND and HADDOU at<br>The North Kings Highway Apartment Complex on June 21, 2023

29.     On June 21, 2023, law enforcement utilized CS-1 to conduct a controlled purchase of approximately 2, 000 fake oxycodone pills suspected to contain fentanyl for $4,000, from HAMMOND. CS-1 contacted HAMMOND to coordinate the purchase. Under law enforcement direction, CS-1 purchased the fake oxycodone pills containing fentanyl from HADDOU, who HAMMOND sent to conduct the transaction on his behalf, behind a stairwell near the parking garage entrance at the North Kings Highway Apartment Complex. The pills were submitted to the DEA Mid-Atlantic Lab for analysis, which revealed the substance was 1,927 counterfeit pills with a weight of 207.18 grams.

30.     Prior to the controlled purchase from HADDOU, agents conducting surveillance of the parking garage at the North Kings Highway Apartment Complex, observed HADDOU exit the parking garage. A short time after agents observed this, HAMMOND texted CS-1 and stated that his "brother had to go pick it up and he's coming back there." Agents followed HADDOU to

a townhouse in Alexandria, VA, and observed the vehicle HADDOU was driving parked in front

of the townhouse for a short moment. Agents observed HADDOU then exit the neighborhood

and followed it back to the parking garage of the North Kings Highway Apartment Complex.

While HADDOU was travelling back to the North Kings Highway Apartment Complex, CS-1

advised law enforcement that HAMMOND had contacted him to tell him that his guy was

coming. A short time later, HADDOU met with CS-1 and CS-1 purchased the approximate 2,000

fake oxycodone pills from HADDOU. After the deal, agents conducting surveillance inside the

parking garage at the North Kings Highway Apartment Complex, observed HADDOU enter the

parking garage and get inside a vehicle.

[CONTINUED ON NEXT PAGE]

## IV.    CONCLUSION

31.    Based on the facts outlined above, I respectfully submit that there is probable

cause to believe that from in or about at least March 2023, and continuing thereafter up to and

including on or around June 2023, the exact dates being unknown, within the Eastern District of

Virginia and elsewhere, the defendants, CARRINGTON JARIUS HAMMOND, a/k/a Tattoo,

a/k/a Blitz, and MOHAMED AMINE HADDOU, did unlawfully, knowingly, and intentionally

combine, conspire, confederate and agree with others, known and unknown, to unlawfully,

knowingly, and intentionally distribute 400 grams or more of a mixture and substance containing

a detectable amount of fentanyl, a Schedule II controlled substance, in violation of 21 U.S.C. §§

841(a)(1) and 846. I declare under penalty of perjury that the foregoing is true and correct to the

best of my knowledge and belief.

*Vanessa Drew*
Vanessa Drew
Special Agent
Drug Enforcement Administration


Subscribed and sworn to in accordance
with Fed. R. Crim. Proc. 4.1
by telephone on August 9, 2023.


_____
The Honorable John F. Anderson
United States Magistrate Judge

13